117 F.3d 1015
 Rod GUSTAFSON and Javier Cornejo, Plaintiffs-Appellants,
v.
Arthur JONES, Deputy Inspector, Jeffrey Bialk, Captain, and
Philip Arreola, Chief, in their individual and
official capacities, Defendants-Appellees.
 No. 96-1991.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1996.
Decided June 27, 1997.
 
 John F. Fuchs (argued), Susan C. Minahan, Marcia A. Snow, Fuchs, Snow & O'Connell, Milwaukee, WI, for Plaintiffs-Appellants.
 Rudolph M. Konrad, Office of the City Attorney, Milwaukee, WI, Melanie R. Swank (argued), Milwaukee City Attorney's Office, Milwaukee, WI, for Defendants-Appellees.
 Before RIPPLE, MANION, and DIANE P. WOOD, Circuit Judges.
 DIANE P. WOOD, Circuit Judge.
 
 
 1
 Few subjects are more prominently in the public eye today than the fight against crime. In this case, two officers of the Milwaukee Police Department, Rod Gustafson and Javier Cornejo, claimed that they attempted to voice their concerns about the way in which police officers were deployed by the department and found themselves first transferred from the prestigious Tactical Enforcement Unit (TEU) to street jobs, and later passed over for available promotions. They sued Arthur Jones, the Deputy Inspector, Jeffrey Bialk, the Captain to whom they reported, and Philip Arreola, the Chief of Police, under 42 U.S.C. § 1983, alleging that these actions were taken in retaliation for their exercise of their right to free speech under the First Amendment and that the transfers violated their due process rights. Magistrate Judge Aaron Goodstein granted judgment on the pleadings to all three defendants. We agree that the complaint stated no claim under the due process clause, but we reverse and remand for further proceedings on the First Amendment claims.
 
 
 2
 * As of 1993, Gustafson had been with the Milwaukee Police Department's TEU for approximately five years, while Cornejo had about two years' service with the unit. In July of that year, the two officers responded to a shooting incident. About a week later, they decided on their own initiative to try to locate the shooter. While they were doing so, the original complainant saw them and gave them several leads, which they attempted to pursue. They remained available to their dispatcher throughout this time, and indeed, around 10:15 p.m. as they were leaving the suspect's house, they were contacted by another tactical unit and told that they were wanted in District 7. Cornejo called the dispatcher to get permission to go to District 7; at the same time, Deputy Inspector Jones called Gustafson on the police radio and gave instructions that Gustafson and Cornejo were to cease all further follow-up on the shooting incident and in the future to take assignments only from the dispatcher. As a result, they were unable to arrest the suspect, who they had been told was a member of a local gang and was extremely dangerous.
 
 
 3
 Later the same evening, Jones issued an order prohibiting all members of the TEU from conducting any follow-up investigations or assisting the Detective Bureau without his direct authorization. Gustafson and Cornejo had some concerns about the new policy and the way in which the July 13 incident had been handled, which they communicated to several of their co-workers, including officials of their union, the Milwaukee Police Association. An anonymous source then leaked copies of Jones' order and the police reports Gustafson and Cornejo had prepared about their July 13 investigation to the Milwaukee Journal/Sentinel and to several Milwaukee alderpersons. Ultimately, Jones was pressured by both the media and local politicians to rescind the order.
 
 
 4
 On November 21, 1993, Gustafson and Cornejo were transferred from TEU to street duty in two separate districts. These transfers were unusual, in that transfers normally occurred for one of three reasons: (1) promotion, (2) on request, or (3) discipline. These were clearly not promotions, nor had Gustafson or Cornejo requested a transfer. When they asked Captain Bialk the reason for the transfers, he refused to provide an explanation. In April 1994, a notice was posted announcing that open positions were available in the TEU. Both Gustafson and Cornejo applied, and they were both ranked at the top of the list of the 58 candidates. Notwithstanding their qualifications, however, they were not among the seven individuals selected for the positions. They filed the present suit on December 22, 1994.
 
 II
 
 5
 A motion for judgment on the pleadings under Fed.R.Civ. P. 12(c), like a motion for failure to state a claim under Fed.R.Civ.P. 12(b)(6), should not be granted "unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. In evaluating the motion, we [ ] view the facts in the complaint in the light most favorable to the nonmoving party." Frey v. Bank One, 91 F.3d 45, 46 (7th Cir.1996), quoting GATX Leasing Corp. v. National Union Fire Ins. Co., 64 F.3d 1112, 1114 (7th Cir.1995). We review the district court's decision de novo, which in this case requires us to examine three issues: whether the pleadings stated a claim under the First Amendment, whether they stated a claim under the Fourteenth Amendment's due process clause, and whether the three defendants were entitled to qualified immunity from suit.
 
 A. First Amendment
 
 6
 In order to establish a First Amendment retaliation claim, the facts alleged in the complaint must show that (1) the speech in which the plaintiffs engaged was constitutionally protected under the circumstances, and (2) the defendants retaliated against them because of it. Caldwell v. City of Elwood, Ind., 959 F.2d 670, 672 (7th Cir.1992), quoting Barkoo v. Melby, 901 F.2d 613, 617 (7th Cir.1990). The particular speech on which the complaint focuses is the conversation the plaintiffs had with their co-workers and union officials about the events of July 13 and Jones' subsequent order forbidding self-initiated investigations. This speech, plaintiffs allege, was on a matter of public concern, namely, "the ability of police officers to quickly and effectively respond to law enforcement needs as they arise." This meant, they assert, that it was entitled to First Amendment protection. See Dishnow v. School Dist. of Rib Lake, 77 F.3d 194, 197 (7th Cir.1996) (speech on matters of "public concern" means "matters in which the public might be interested, as distinct from wholly personal grievances or 'casual chit-chat' "). See also Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983).
 
 
 7
 The defendants counter with three arguments. First, they claim that the plaintiffs' allegations were insufficient as a matter of law because they did not specify the content of their speech more specifically and they did not allege that the defendants were aware of it; second, they argue that the speech was not on a matter of public concern; and finally, they argue that even if the speech was protectable, the balancing test established by Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) requires judgment for the defendants.
 
 
 8
 Bearing in mind that we are just evaluating the pleadings, we find that the plaintiffs adequately alleged both the content of their speech and the defendants' awareness of it. The complaint specifically claimed that the plaintiffs were transferred because of the speech, in paragraphs 17 and 18, and it describes the nature of the speech. The course of events alleged in the complaint would permit the plaintiffs to prove that the defendants were aware of Gustafson and Cornejo's complaints and that this was the reason for the transfer, based on the timing, the workplace location of the speech, and the publicity about Jones' order. Had it not been for their discussions with co-workers and union officials, the anonymous source might never have tipped off the local media and politicians about the debate at all; or at least, a jury might find that the defendants saw things that way. The allegations about the retaliatory transfer distinguish this case from Caldwell, supra, where the plaintiffs alleged nothing other than the timing of the disciplinary action to link the speech to it. There was little reason in Caldwell to think that the mayor would otherwise have had a role in the plaintiff's suspension, while this case presents detailed accusations about the supervisory roles Jones, Bialk, and Arreola had.
 
 
 9
 The question whether the speech touches on a matter of public concern is more relevant to the defendants' third point, which is that the Pickering test is what determines whether their speech was "protectable" at all. Speech may not be protectable because it is obscene, because it may be regulated under the "commercial speech" doctrine, or because it conflicts with a valid government restriction on the time, place and manner of speech. Defendants, however, are not arguing that any of those reasons deprives Gustafson and Cornejo of their First Amendment rights. Instead, they suggest that public employees do not have any First Amendment rights to begin with when a Pickering/Connick analysis results in the conclusion that the public employer may suppress the speech or take unfavorable actions based upon it.
 
 
 10
 As a matter of pleading, we think the defendants are half right, but not right enough to win on this point. When a public employee alleges that she has suffered retaliation for the exercise of her First Amendment rights, she should be required to allege facts that could support a finding that the speech is on a matter of public concern. (Putting "magic words" in the complaint that certain speech is on a matter of public concern is no more necessary than including other legal arguments in the complaint; the key requirement is to allege speech that, when read within the context of the complaint, could qualify as such under the governing law.) See, e.g., Lashbrook v. Oerkfitz, 65 F.3d 1339, 1349-50 (7th Cir.1995); Caldwell, 959 F.2d at 672. Measured by that yardstick, plaintiffs' complaint again passes the test. This was not speech about merely personal matters; it related to how police investigations are to be conducted, and what kind of balance between individual officer initiative and central control was to be struck. Although the intense public interest the debate engendered is not dispositive or necessary to demonstrate public concern, see Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-16, 99 S.Ct. 693, 696-97, 58 L.Ed.2d 619 (1979) (speech that occurs wholly within a governmental entity may still touch on a matter of public concern); Brown v. Disciplinary Committee of Edgerton, 97 F.3d 969, 974 (7th Cir.1996) (speech may be protected even if it does not have a large following), where the public takes such an active interest in the matter it is hard to argue that the speech was purely private. See also Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir.1990) (en banc) (noting that issues relating to police protection and public safety are generally matters of public concern); Glass v. Dachel, 2 F.3d 733, 741 (7th Cir.1993) (same).
 
 
 11
 This takes us to the defendants' third point, which suggests that a full Pickering/Connick analysis must take place on the pleadings. That would entail somehow ascertaining from the pleadings (1) that the speech would be protected if uttered by someone who was not a public employee, (2) that it involves something more than an unprotected personal employee grievance, and (3) that the public employer has not shown a convincing reason to forbid the speech. See generally Pickering; Brown v. Disciplinary Comm., supra, at 972. As Gustafson and Cornejo point out, however, it would be nearly impossible for a plaintiff to anticipate and plead every reason that a public employer might have to forbid the speech (which the plaintiff believes is protected in any event) and then to show why those reasons are not convincing. Thus, purely as a matter of good pleading practice, we think it preferable to leave to the defendant the burden of raising justification as an affirmative defense. See Glass, 2 F.3d at 744 (State bears burden of demonstrating that its interests outweigh the employees' First Amendment rights), citing Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). Compare Jefferson v. Ambroz, 90 F.3d 1291, 1296-97 (7th Cir.1996) (plaintiff pleaded himself out of court by including facts in his complaint that established employer would prevail under Pickering balancing test). Furthermore, it would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law on this point, unless the plaintiff was relying on speech that is wholly unprotected by the First Amendment or the defendant's justifications were frivolous. Normally, application of the Pickering balancing test will be possible only after the parties have had an opportunity to conduct some discovery. See, e.g., Glass, 2 F.3d at 742-44 (summary judgment); Breuer v. Hart, 909 F.2d 1035, 1039 (7th Cir.1990) (same).
 
 
 12
 This case illustrates the point well. From the pleadings, it is impossible to say whether the Police Department's interest in controlling the way in which its officers are assigned to different types of duty outweighs the public interest in participating in the debate over the best policy. The people in the neighborhood of the shooter Gustafson and Cornejo were trying to apprehend might have had a strong interest in knowing that Deputy Inspector Jones thought that police officers should not be permitted to take the initiative to effect an immediate arrest of a dangerous criminal in their midst. The officers' speech, in short, touched on a matter of strong public concern, which in turn means that the Department officials would need to offer particularly convincing reasons to suppress it. The mere possibility of such reasons is not enough to justify judgment on the pleadings for the defendants.
 
 B. Due Process
 
 13
 In order to show a violation of procedural due process, the plaintiffs had to show that they possessed a protected life, liberty, or property interest in their TEU assignment as a matter of substantive law and that the process offered by the state did not meet constitutional standards. See Listenbee v. City of Milwaukee, 976 F.2d 348, 351 (7th Cir.1992). Here, Gustafson and Cornejo argue that they had both protected property interests and liberty interests that were infringed. They point out that Wisconsin recognizes a property interest in continued employment with the Police Department, through Wis. Stat. Ann. § 62.50(11) (discharges and suspensions only allowed if issued for cause). We have found liberty deprivations in cases where "the employee was fired for a publicly announced reason that impugned his moral character," Lawson v. Sheriff of Tippecanoe County, Ind., 725 F.2d 1136, 1138 (7th Cir.1984), or if the person is demoted to a position "far beneath the one he had." Id. at 1139.
 
 
 14
 The problem Gustafson and Cornejo face with both these theories is simple: they have shown neither a protected property interest nor a protected liberty interest. With respect to their property argument, they run into trouble under Wisconsin law, which does not mention a property interest in particular job assignments on the police force. The Supreme Court of Wisconsin has twice indicated that the Chief of Police has wide discretion in making transfer decisions. See City of Milwaukee v. Milwaukee Police Ass'n, 97 Wis.2d 15, 292 N.W.2d 841, 849 (1980); Milwaukee Police Ass'n v. City of Milwaukee, 92 Wis.2d 145, 285 N.W.2d 119, 125 (1979). The plaintiffs have not directed our attention to any contractual or statutory provision indicating that they had a protected right to remain on the TEU; indeed, they implicitly concede that no such rules exist when they argue that property interests can be created even without a formal contractual provision. Again, however, the cases on which they rely stand only for the proposition that a protected property interest may exist that protects continued government employment in general; none of them address an interest in specific job assignments. See Dahlinger v. Town Board of Town of Delavan, 381 F.Supp. 474, 476-77 (E.D.Wis.1974); Mathias v. City of Milwaukee Dept. of City Development, 377 F.Supp. 497, 501 (E.D.Wis.1974). We would not go so far as to say that there can never be a property interest in a job assignment, see Greenberg v. Kmetko, 840 F.2d 467, 475 (7th Cir.1988) (en banc); Thornton v. Barnes, 890 F.2d 1380, 1388 & n. 9 (7th Cir.1989). In this case, however, it could not be plainer that Wisconsin does not recognize a property interest in job assignments within the Milwaukee Police Department. With no protected interest, the plaintiffs have no due process claim.
 
 
 15
 Their argument based on a liberty interest suffers from an analogous flaw. Relying on Lawson, the plaintiffs alleged that their transfer from the TEU was regarded as a demotion. Nonetheless, the complaint itself leaves no doubt that it was not a demotion "far beneath" their former position, such as a change from the elite TEU to an office file clerk or the equivalent. They understandably do not allege that they were publicly defamed by being assigned to street duty. In short, they have not set forth the kind of case that could implicate a liberty interest. With no protected interest, they fail the first part of the due process test. We therefore have no need to consider what kinds of procedures the Police Department used or whether they would have been adequate for protectable interests.
 
 C. Qualified Immunity
 
 16
 Gustafson and Cornejo filed this suit against the three defendants in both their official capacities and their individual capacities. With respect to the individual capacity claims, the defendants argued below that they were entitled to qualified immunity from suit. Although the district court elected not to reach this claim, we consider it because it potentially would be an alternative ground on which to affirm the judgment below.
 
 
 17
 Public officials performing discretionary functions are entitled to qualified immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Erwin v. Daley, 92 F.3d 521, 525 (7th Cir.1996). The test is an objective one, as we have often noted, and we must ask as a practical matter whether a reasonable official would have understood that what she was doing was unlawful. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Kerr v. Farrey, 95 F.3d 472, 480 (7th Cir.1996).
 
 
 18
 It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights, including in particular retaliation through a transfer to a less desirable position. See, e.g., McGill v. Board of Educ. of Pekin Elem. Sch. Dist. 108, 602 F.2d 774 (7th Cir.1979); Egger v. Phillips, 710 F.2d 292, 324 (7th Cir.1983) (en banc) (Cudahy, J. concurring) (noting McGill decision established that a retaliatory job transfer could be the subject of a First Amendment challenge). See also Knapp v. Whitaker, 757 F.2d 827, 843-44 (7th Cir.1985) (upholding a jury finding of First Amendment retaliation based, in part, on an unwanted job transfer). It has also been clear for years that speech about police protection and public safety raises matters of public concern. See Auriemma, 910 F.2d at 1460; Glass, 2 F.3d at 741. Here, the pleadings show that the speech was on a matter of public concern and they do not reveal how the Police Department might go about showing its interest in nevertheless suppressing it. The pleadings also adequately allege that the decision to transfer the two officers was retaliatory in nature. Under these circumstances, it would be premature to find qualified immunity for the defendants.
 
 
 19
 The defendants have suggested that our decision in Walsh v. Ward, 991 F.2d 1344 (7th Cir.1993), effectively held that qualified immunity will always be available when the Pickering balancing test is to be used. A more careful reading of Walsh, however, shows that it did not go so far. Indeed, by way of contrasting the tenuous nature of Walsh's own claim there, the court noted that "[t]here are plenty of cases like McGill, involving a transfer to a job less desirable on its own terms," id. at 1346, implying that in such routine cases reasonable supervisors would have understood that their actions were unlawful. The court's comments simply noted an undeniable fact about balancing tests, which is that they produce a wide gray area between the clearly legal and the clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area. This is especially important in light of the risk of bureaucratic paralysis that a fear of damages could induce in supervisors. This does not mean, however, that legal certainty never exists when the law demands the consideration of a number of different factors. Here, the plaintiffs have alleged facts that could bring them within the well established rules protecting speech about public safety administration, both within and outside the workplace. Compare Greenberg v. Kmetko, supra, 840 F.2d at 474 ("[plaintiff's] statements might conceivably have come within the scope of public concern and the government's interest in promoting the efficiency of the public services it performed in this case may not have outweighed [plaintiff's] right to speak"). This does not preclude the defendants at the summary judgment stage from introducing evidence that might reveal a justification for their situation that would support a finding of immunity, but it does indicate that they are not entitled to a finding on the pleadings that they enjoy qualified immunity from suit.
 
 D. Official Liability
 
 20
 The plaintiffs' suit against the three defendants in their official capacities must be analyzed as a suit against the City of Milwaukee itself, even though the plaintiffs never attempted to sue the City nor did the defendants seek any substitution of parties. See Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). The complaint alleged that "[t]he Milwaukee Police Department has in the past, and continues to, engage in a practice of retaliatory transfer, discipline, and discharge." Although, as the plaintiffs correctly point out, the Supreme Court held in Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), that ordinary notice pleading suffices for § 1983 claims against municipalities, Leatherman is not the last word on the subject. More recently, the Court addressed this kind of claim in Board of County Commissioners of Bryan County v. Brown, --- U.S. ----, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In Brown, the Court held that a single hiring decision by a county sheriff was not enough to show that the County itself had a policy or custom that caused the plaintiff's injuries. The plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id. at 1388. Gustafson and Cornejo's complaint bases its claim of a practice of the Police Department on the same kind of isolated incidents that the Court found wanting in Brown. We therefore find no error in the district court's dismissal of the official capacity claims on the pleadings.
 
 
 21
 To summarize, we have found that the district court should not have dismissed the plaintiffs' individual capacity claims based on their First Amendment rights on the pleadings. We have also found that it would be premature at this stage to rule that the individual defendants were entitled to qualified immunity from suit. On the other hand, we agree with the district court that the plaintiffs failed to state a claim under the due process clause and that the suit had to be dismissed insofar as it sought to reach the defendants in their official capacities. The judgment of the district court is therefore AFFIRMED IN PART, and REVERSED AND REMANDED IN PART for further proceedings. Costs will be borne by the defendants-appellees.