# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-1231

NORVAL WILLIAMS,

*Plaintiff-Appellant,*

v.

RICK SENIFF, individually and in his capacity as Sheriff of
St. Joseph County, Indiana, GANPAT WAUGH, individually
and in his capacity as Chief of Police of St. Joseph County,
Indiana, CHRISTOPHER TOTH, individually and in his official
capacity as Prosecuting Attorney of St. Joseph County,
Indiana, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 00 C 333—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED SEPTEMBER 12, 2002—DECIDED AUGUST 20, 2003

———————

Before RIPPLE, ROVNER and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Norval Williams was employed by
the St. Joseph County Sheriff's Department as an Assistant
Chief of Police. He was fired after he made a comment in
the media questioning the guilt of an individual who had
been convicted of killing a police officer. Mr. Williams
claimed that he suffered racial discrimination in his work-
place and that the defendants conspired to retaliate against

him after he made the comment. He therefore filed this action, alleging violations of 42 U.S.C. §§ 1983 and 1985 based on deprivations of his First Amendment free speech, procedural due process and equal protection rights. Invoking Title VII, *see* 42 U.S.C. § 2000e et seq., he also claimed that he had suffered racial discrimination. Finally, he alleged a state law claim for interference with contractual relations under Indiana law. The district court dismissed a portion of Mr. Williams' claims under Federal Rule of Civil Procedure 12(b)(6) and later granted summary judgment on the remaining claims. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Mr. Williams, an African-American, was hired by then-St. Joseph County Sheriff, Rick Seniff, to serve as an Assistant Chief of Police, beginning on January 1, 1999. One of Mr. Williams' responsibilities was to oversee security for the St. Joseph County Courthouse in South Bend, Indiana. Serving in this oversight capacity in June of 1999, Mr. Williams attended the trial of Gregory Dickens, an African-American youth who was tried before an all-white jury for the murder of a white South Bend police officer. The jury convicted Dickens.

At some time during the trial or after the verdict was returned, Mr. Williams commented to television and newspaper reporters that "if the person who committed the murder was not on trial, the verdict would not be just." R.1 at ¶ 5. Mr. Williams contends that his statement "mirrored doubts felt and expressed by other members of the African

American community of South Bend, Indiana," related to a matter of public concern, and "was not without reasonable basis and foundation." R.1 at ¶ 7. Mr. Williams further alleges that a witness had called to inform him that the real murderer was not on trial. Mr. Williams claims he disclosed this communication to both the prosecution and the defense in Dickens' trial. However, the witness feared for her personal safety and subsequently refused to testify. Mr. Williams contends that, after he made the statement in the media, he was subjected to great anger and was forced to endure race-based hostility in his workplace.

Mr. Williams maintains that, after he made this statement, South Bend Mayor Stephen Luecke, then-St. Joseph County Prosecuting Attorney Christopher Toth, and Fraternal Order of Police ("F.O.P.") Lodge 36 President Joseph Lauck expressed displeasure and exerted pressure on Sheriff Seniff to fire Mr. Williams. These individuals admit that they called Sheriff Seniff to express their displeasure with Mr. Williams' comment, but the defendants deny that they requested that Sheriff Seniff fire Mr. Williams.[1]

Mr. Williams claims that, during his approximately seven-month tenure on the police force, Sheriff Seniff displayed an intent to discriminate against him by refusing to hire minority job applicants in lieu of white applicants, as well as by excluding him from input in the hiring process and from social activities. Mr. Williams also contends that he was singled out for an unprecedented performance evalua-

---

[1] Mr. Lauck stated that his call to Sheriff Seniff was in response to a call placed to Mr. Lauck's pager by the Sheriff. *See* R.80, Ex.Lauck Aff. at ¶ 4. Mr. Lauck's affidavit indicates that the Sheriff stated he had heard that the F.O.P. was displeased with Mr. Williams' comment, a fact that Mr. Lauck confirmed. *See id.* at 5.

tion that was not given to similarly situated white officers. On August 4, 1999, Sheriff Seniff summoned Mr. Williams to a performance evaluation meeting. During the session, Sheriff Seniff terminated Mr. Williams' employment based on allegations of poor job performance, Mr. Williams' negative response to criticisms and Mr. Williams' failure to submit to a polygraph test. Mr. Williams maintains that these claims were mere pretext for a race-based termination.

Mr. Williams contends that, after his termination, Sheriff's Department Chief of Police Ganpat Waugh ("Chief Waugh") and St. Joseph County Police Merit Board members Terry O'Connor, Mary Jane Clark, Donald Decker, Michael Anderson and Jon Hanley (collectively "Merit Board members"), improperly acquiesced in his illegal termination. Mr. Williams claims that the Merit Board members had the authority and duty to challenge the termination directly or to grant a hearing at which Mr. Williams might answer charges and present a defense. He claims that the Merit Board members failed to exercise their authority with the intent that Sheriff Seniff would terminate Mr. Williams in retaliation for the comment in the media.

Moreover, Mr. Williams alleges that Chief Waugh participated in the pretextual performance review and wrongful termination and that Chief Waugh had the jurisdiction and authority to stop the conspiracy to deprive Mr. Williams of his rights. Mr. Williams contends that Chief Waugh is liable for failing to stop or investigate the illegal actions of Sheriff Seniff, Mayor Leucke, Mr. Toth and Mr. Lauck.

**B. District Court Proceedings**

Before the district court, Mr. Williams named Sheriff Seniff, Chief Waugh, Mr. Toth, Mr. Lauck, Mayor Luecke and the Merit Board members, all individually and in their

official capacities, in a six-count complaint filed on May 26, 2000. Count I alleged that Mayor Luecke, Mr. Toth and Mr. Lauck conspired with Sheriff Seniff to deprive Mr. Williams of his First Amendment free speech rights by pressuring Sheriff Seniff to terminate Mr. Williams in retaliation for his statement in the media. The first count also claimed that the Merit Board members and Chief Waugh violated Mr. Williams' First Amendment rights by failing to intervene and stop his termination. Mr. Williams alleged that all of the defendants' actions constituted violations of both 42 U.S.C. §§ 1983 and 1985.

In the second and third counts of his complaint, Mr. Williams alleged that all named defendants, individually and in their official capacities, deprived him of his equal protection rights by forcing him to work in a hostile and discriminatory work environment and violated his due process rights by depriving him of his liberty and property interests in continued employment as Assistant Chief of Police, both in violation of 42 U.S.C. §§ 1983 and 1985.

Mr. Williams' fourth count alleged that he had suffered disparate treatment and a hostile work environment in violation of Title VII. The complaint stated that the creation of a hostile work environment was undertaken by all named defendants individually and in their official capacities in furtherance of the deprivations alleged in Counts I through III. However, the complaint specifically singled out the actions of Sheriff Seniff as his employer and Mr. Lauck in his capacity as an agent for the F.O.P., which Mr. Williams characterizes as a labor union. Finally, in the fifth count of the complaint, Mr. Williams alleged that all defendants committed a wrongful and tortious breach of contract under

Indiana law.[2]

In an order issued on October 5, 2000, the district court addressed a number of motions for dismissal on the pleadings. First, the court noted that, in response to Mayor Luecke's motion to dismiss, Mr. Williams had stated that Mayor Luecke's actions occurred "in the course of his official duties and while exercising his responsibilities as Mayor of South Bend, Indiana [and] nothing in the complaint alleges or indicates that [Mayor] Luecke was 'off-duty' or somehow acting as a private individual when he became involved in the conspiracy." R.41 at 6-7 (quoting Williams Resp. at 8). Consequently, the court determined that the complaint only alleged action in the Mayor's official capacity, and the court dismissed claims against Mayor Luecke in his individual capacity. The court then ruled that Mr. Williams could proceed on the claims against Mayor Luecke in his official capacity. On June 14, 2001, the court granted Mr. Williams' and Mayor Luecke's joint motion to voluntarily dismiss the remaining claims as to Mayor Luecke in his official capacity. Mr. Williams has not appealed the dismissal of claims against the Mayor.

The court then addressed Mr. Lauck's Rule 12(b)(6) motion. The motion claimed that the conspiracy allegations of Mr. Williams' complaint were insufficient, that Mr. Lauck was not a state actor, that the speech in question was not protected, and that the state law claims in Count V did not properly contain any allegations against Mr. Lauck or the F.O.P. The court granted Mr. Lauck's motions with respect to Count V because the pleading alleged only a breach of an employment agreement and because Mr. Lauck was not in

---

[2] Mr. Williams' sixth count does not allege an additional cause of action; rather, it details the harm that he suffered from the claims set forth in the first five counts.

privity in the employment contract with Mr. Williams. Although in his brief in opposition to the motion to dismiss Mr. Williams pointed out that the Indiana torts of interference with an employment relationship and interference with a contractual relationship do not require privity of contract, the court rejected this argument as an impermissible attempt to amend the complaint through a motion to dismiss. Consequently, the court concluded that the pleading did not give Mr. Lauck reason to believe that he should seek dismissal of claims for contractual interference with his employment relationship. *See* R.41 at 11.

The district court dismissed all claims against the Merit Board members in their official and personal capacities. It reasoned that, under the Indiana Code, Mr. Williams was an at-will probationary employee; as such, the Merit Board members did not have jurisdiction to review Mr. Williams' termination. Moreover, the court concluded that the Merit Board members were acting in a quasi-judicial capacity and therefore were entitled to absolute immunity.

With respect to Mr. Toth, the court relied on the Eleventh Amendment to dismiss the claims brought against him in his official capacity as a state prosecutor. The court also dismissed Mr. Williams' Count V interference with contract obligations claim against Mr. Toth in his individual capacity for the same reason it dismissed Mr. Williams' claim against Mr. Lauck—the absence of privity of contract with Mr. Williams. Moreover, the court dismissed the Title VII claim against Mr. Toth in his individual capacity, recognizing that Mr. Toth could not be characterized as Mr. Williams' employer and because no individual liability exists under Title VII.

Having had his claims against Mr. Lauck and Mr. Toth for

tortious breach of contract dismissed for lack of privity, Mr. Williams made a motion for leave to file a First Amended Complaint, which sought to more clearly outline his state law claim of tortious interference with a contractual relationship. In an order dated November 20, 2001, the district court refused Mr. Williams' motion because it continued to refer "in the caption and in the text, to parties and claims that were dismissed in [an earlier order]." R.58 at 2.

Finally, on December 27, 2001, after the parties had conducted discovery, the district court granted summary judgment in the defendants' favor on all remaining claims. The court found that Mr. Williams had not presented sufficient evidence to survive summary judgment motions on his remaining § 1983, § 1985 and Title VII claims. *See* R.81.

## II

## DISCUSSION

Mr. Williams submits that the defendants, acting in their official and individual capacities, deprived him of his First Amendment right to free speech as well as of his rights to equal protection and due process under the Fourteenth Amendment. He also claims that Sheriff Seniff and Chief Waugh conspired with Mr. Lauck, Mr. Toth and Mayor Luecke[3] to deprive him of those rights. *See* 42 U.S.C. § 1985. Moreover, Mr. Williams contends that Sheriff Seniff's and Mr. Lauck's actions constituted disparate treatment and created a hostile work environment in violation of Title VII. He also maintains that his termination was a result of tor-

---

[3]  As we have noted above, Mayor Luecke was dismissed from the case on June 14, 2001, and he is not a party to this appeal.

tious interference with his employment contract.

We review de novo the district court's grants of summary judgment and motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and draw all favorable inferences in favor of the nonmovant, Mr. Williams. *See Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (reviewing de novo grant of motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)); *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003) (reviewing grant of summary judgment de novo).

## A. First Amendment

### 1. *Connick-Pickering* Analysis

When a government employee is terminated and alleges that his exercise of protected speech motivated the termination, we initially evaluate whether the First Amendment protects the employee's speech by conducting the two-part analysis set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983). *See Wainscott v. Henry*, 315 F.3d 844, 848 (7th Cir. 2003).

The first element of the *Connick-Pickering* test requires that we consider whether the speech in question addresses a matter of public concern. *See Delgado v. Jones*, 282 F.3d 511, 516 (7th Cir. 2002) (citing *Connick*, 461 U.S. at 147). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. We have determined that the content of the speech is the most important consideration. *See Delgado*, 282 F.3d at 517. The second element, the *Pickering* balancing test, requires us

> to determine whether "the interests of the [plaintiff], as
> a citizen, in commenting upon matters of public con-

cern" outweigh "the interest of the State, as an em-
ployer, in promoting the efficiency of the public services
it performs through its employees."

*Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (quoting
*Pickering*, 391 U.S. at 568). Both prongs of the *Connick-
Pickering* test are matters of law that this court reviews de
novo. *See Wainscott*, 315 F.3d at 851 (stating that resolution
of *Pickering* balancing test is a question of law); *Snider v.
Belvidere Township*, 216 F.3d 616, 620 (7th Cir. 2000) (noting
that determination of matter of public concern is for the
court).

If we determine that the employee's speech was constitu-
tionally protected, we then must consider whether the
protected speech was a substantial or motivating factor in
the defendant's actions. *See Gustafson v. Jones*, 290 F.3d 895,
906 (7th Cir. 2002). If the speech was such a factor, the
employer must have the opportunity to prove that it would
have taken the same action regardless of the plaintiff's
exercise of First Amendment rights. *See Vukadinovich v.
Bartles*, 853 F.2d 1387, 1389-90 (7th Cir. 1988) (quotation
marks and citations omitted). However, we need not reach
the issue of the employer's motivations if the plaintiff's
statements are not constitutionally protected. *See id.* at 1390
n.5.

The first step in the analysis requires that we determine
whether Mr. Williams' speech addressed a matter of public
concern. At some point during or after the Dickens trial, Mr.
Williams commented to reporters, "if the person who
committed the murder was not on trial, the verdict would
not be just." R.1 at ¶ 5.[4] Mr. Williams contends that his

---

[4] This quotation is taken from Mr. Williams' complaint; the
(continued...)

statement "mirrored doubts felt and expressed by other members of the African American community of South Bend, Indiana" and that it was based on information from a witness that did not testify at the trial. *Id.* at ¶ 7. This statement purported to address the validity of a criminal conviction that Mr. Williams claims was influenced by race. Because we believe that the second prong of the *Connick-Pickering* analysis is determinative, we assume, without deciding, that this comment constitutes a matter of public concern. *See Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 164 (2d Cir. 2001) (assuming arguendo that speech addressed matter of public concern and turning to *Pickering* balancing test); *Flynn v. City of Boston*, 140 F.3d 42, 46-47 (1st Cir. 1998) (same).

In *Gustafson*, we outlined a number of factors for consideration in conducting the *Pickering* balancing test:

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson*, 290 F.3d at 909 (citing *Greer v. Amesqua*, 212 F.3d

---

[4]  (...continued)
record neither contains a direct quote nor a transcript of the media reports.

358, 371 (7th Cir. 2000)). The court's opinion in *Kokkinis v. Ivkovich* is also instructive. In *Kokkinis*, a police officer appeared on a television newscast in disguise and shared his views concerning another officer's allegation of sex discrimination within the police department. *See Kokkinis*, 185 F.3d at 842. The court found that Kokkinis had no knowledge of the incident; rather, he had a personal dispute with the Police Chief.[5] The Police Chief was embarrassed by the broadcast and believed that the department as a whole was placed in a negative light. The Chief also received phone calls complaining about the interview. *See id.* We concluded that the *Pickering* balancing test weighed in favor of the defendants because "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Kokkinis*, 185 F.3d at 845.[6]

---

[5]   In *Kokkinis*, we held that the motive of the officer in making the statements ostensibly about sex discrimination was a private feud; therefore, the statements did not constitute a matter of public concern. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 844-45 (7th Cir. 1999). However, we addressed the *Pickering* balancing test in the alternative. *See id.* at 845.

[6]   We note that in *Gustafson v. Jones*, 290 F.3d 895 (7th Cir. 2002), we reached the opposite result and concluded that a police department had violated two police officers' free speech rights by transferring them out of their elite tactical unit in retaliation for publicly criticizing an order of the department's deputy inspector. We noted that, due to the need for relationships of trust and loyalty on a police force, deference given to police departments under the *Pickering* analysis is considerable; however, it is "by no means complete." *Id.* at 910 (citing *Waters v. Churchill*, 511 U.S. 661, 677 (1994)). However, the result in *Gustafson* is distinguishable from the present case. In *Gustafson,* there was neither
(continued...)

In an organization such as a police department, discipline and respect for the chain of command are critical to accomplishing the entity's mission of maintaining order and public safety. *See Dill v. City of Edmond*, 155 F.3d 1193, 1203 (10th Cir. 1998) (stating that in the context of law enforcement the government has a " 'heightened interest . . . in maintaining discipline and harmony among employees.' " (citation omitted)); *Tyler v. City of Mountain Home*, 72 F.3d 568, 570 (8th Cir. 1995) (commenting that paramilitary character and mission of police departments results in greater latitude in discipline and personnel matters than a normal government employer). As an Assistant Police Chief, Mr. Williams served in a position of loyalty and confidence. He breached those by making the statement to the press. *See Klunk v. County of St. Joseph*, 170 F.3d 772, 776 (7th Cir. 1999) (noting that a police officer's position contains a duty of loyalty and confidence); *Upton v. Thompson*, 930 F.2d 1209, 1215 (7th Cir. 1991) (commenting on need for loyal deputies for elected sheriff to promote public confidence in law enforcement).

In addition to violating his duty of personal loyalty to Sheriff Seniff, it is undisputed that Mr. Williams' conduct resulted in a number of phone calls to Sheriff Seniff similar to those in *Kokkinis* demonstrating the displeasure of various

---

[6] (...continued)

evidence that the speech was disruptive, nor that the defendants believed it would have future disruptive consequences. *See id.* The case turned on a failure of proof. Moreover, we emphasized that the manner and means of the employee's speech is critical. *See id.* at 912 (noting the significance of the fact that the complaining officers properly took their concerns up the chain of command). In this case, the public manner and means of Mr. Williams' speech was inappropriate, and the speech clearly had a significant disruptive impact within the police department.

individuals with Mr. Williams' public statement. Moreover, Mr. Williams' comment created significant unrest in the law enforcement community, almost enough to precipitate his expulsion from the F.O.P. *See* R.80, Ex.Lauck Aff. at ¶ 3; *Tedder v. Norman*, 167 F.3d 1213, 1215 (8th Cir. 1999) (holding that deposition testimony of deputy director of police training academy, which upset crucial business relationships with other law enforcement agencies, was significant in *Pickering* analysis); *Tyler*, 72 F.3d at 570 (noting significance of negative impact on interagency relationships caused by employee's speech).

Additionally, as Assistant Chief of Police, Mr. Williams was charged with oversight of security at the Dickens trial. *See* R.76, Ex.Williams Dep. at 100 (Mr. Williams stating that his official role at the Dickens trial as Assistant Chief of Police was to be "in charge of people who worked in the courthouse and [to provide] security for the courthouse. I was in charge of the jail where he was housed."); R.76, Ex.Seniff Dep. at 79 (stating that a captain was primarily responsible for courtroom security at the Dickens trial, but that if there were any problems the Assistant Chief, Williams, would be the next in line in the organizational chart to address security issues). Given his relationship to the judicial proceedings as the Assistant Chief of Police responsible for security at a trial, there was a significant governmental interest in Mr. Williams' refraining from impugning the validity of the jury verdict to the press during or shortly after the trial.[7]

---

[7] We note that the record does not provide the exact timing or circumstances of Mr. Williams' comment. *See* R.75, Ex.Alan Lieb Dep. at 61-62 (stating that in television report the caption read only "Norval Williams" and did not identify him as a police
(continued...)

These considerations make clear that any limited interest in commenting on the verdict at trial that Mr. Williams may have possessed was outweighed by the considerations of the police department in maintaining appropriate order and discipline. Consequently, Mr. Williams did not have a protected First Amendment right to make his statement to the press. Therefore, Sheriff Seniff and Chief Waugh could not be liable for violating Mr. Williams' First Amendment rights. This conclusion is equally applicable to the remaining First Amendment claims against Mr. Toth, Mr. Lauck and the Merit Board members.

## 2. Existence of Conspiracy

Liability under § 1985 must be predicated on a finding that two or more people agreed to violate the plaintiff's civil rights. *See* 42 U.S.C. § 1985(3). Upon examination of the record, we must conclude that Mr. Williams has not produced sufficient evidence of a conspiracy to violate any of his federally protected rights.[8]

---

[7] (...continued)
department spokesman, nor was Mr. Williams wearing his uniform); R.80, Ex.Toth Declaration at ¶ 7 (stating that comment in the media was made "at the time of the trial"); R.1 at 4 (Mr. Williams' complaint stating that his comment was made "concerning the verdict" in the Dickens case).

[8] In addition to Mr. Williams' claims that the defendants conspired to deprive him of his First Amendment rights in violation of 42 U.S.C. § 1985, his complaint also alleges violations of § 1985 based on the deprivation of his Due Process and Equal Protection rights.

Moreover, Mr. Lauck and Mr. Toth are alleged to have violated 42 U.S.C. § 1983; but they were not in a position to fire Mr.
(continued...)

We begin our appraisal of Mr. Williams' conspiracy claim by noting that our case law makes clear that:

> To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, *Starnes* [*v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1397 (7th Cir. 1994)]; and (2) those individual(s) were "willful participant[s] in joint activity with the State or its agents." *Adickes* [*v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (internal quotation marks and citation omitted)].

*Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). Although a conspiracy certainly may be established by circumstantial evidence, we have stressed that such evidence cannot be speculative. For instance, in *Goetzke v. Ferro Corp.*, 280 F.3d 766 (7th Cir. 2002), we concluded that the existence of numerous phone calls between alleged conspirators, "standing alone, merely proves that [the individuals] remained in contact. . . . To assert that the calls are evidence of a conspiracy is simply speculation." *Id.* at 778. Although a nonmoving party's own deposition may constitute affirmative evidence to defeat summary judgment, conclusory statements in the deposition do not create an

---

[8]  (...continued)

Williams, so any liability must be based on the theory that their participation in the alleged conspiracy violated § 1983. *See Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980) (noting that "[p]rivate parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 . . . ."); *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (concluding that private parties may be liable under 42 U.S.C. § 1983 for jointly engaging with public officials in the denial of civil rights).

issue of fact. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996). In *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 482 (7th Cir. 1995), we noted that the plaintiff had "not offered evidence to rebut the [defendant's] claim that [the defendant's] decision was based on [] legitimate factors, since [] unsupported conjecture is not competent evidence in this regard."

We must conclude that Mr. Williams has not introduced evidence to support his assertions of a conspiracy. He relies upon expressions of displeasure by various public officials with his public statement and his unsupported conjecture that this statement created a conspiracy to fire him for exercising his right to free speech. Mr. Williams' "smoking gun" is Sheriff Seniff's statement in the termination hearing:

> I think you have strained relations with the prosecutors [sic] office, with the South Bend Police Department and with a lot of the public. You've damaged relationships. I told you before I got calls from the mayor's [sic] office, I got calls from the Chief of Police, I got calls from the FOP, I got calls from the Prosecutors [sic] Office. Yes, I think you are straining relations.

R.39, Ex.1 at 3. This statement indicates that various individuals expressed displeasure with Mr. Williams' statement; it does not provide evidence of an *agreement* on the part of those who expressed the displeasure to deprive Mr. Williams of his rights.

As additional evidence of Mr. Toth's participation in the alleged conspiracy, Mr. Williams introduced the deposition testimony of Alan Lieb, an acquaintance and political supporter of Mr. Toth. Lieb stated that he had called Mr. Toth and said, "Chris, [] I can't believe you're involved with this case. . . . I'd like to see what I can do, if there's anything I can do to get you out of this." R.75, Ex.Alan Lieb Dep. at 59. To which Mr. Toth responded, "There's nothing you can

do. I'm right in the middle of it." *Id.* Lieb testified that Mr. Toth told him a number of people had called him to complain about Mr. Williams' comment in the media. *See id.* at 60. Lieb also stated that Mr. Toth indicated that he was "involved in the termination of employment." *Id.* at 66-68. However, Lieb had trouble remembering Mr. Toth's exact words. When initially asked whether the "involvement" could have been simply a complaint to Sheriff Seniff, Lieb responded, "No, not when there's a termination involved, no. No. Absolutely not." *Id.* at 66. However, Lieb ultimately admitted that the level of involvement "very possibl[y]" could have referred only to Mr. Toth's call to Sheriff Seniff to complain about Mr. Williams' comment. *Id.* at 67-68. Additionally, Lieb admitted that Mr. Toth did not elaborate on the level of his "involvement." *Id.* at 68. This vacillating testimony only confirms that Mr. Toth was involved in the events surrounding Mr. Williams' termination, and Mr. Toth readily admitted that he had complained to Sheriff Seniff about Mr. Williams' statement. We cannot say, however, that this testimony constitutes evidence from which a conspiracy may be inferred. Accordingly, the district court's grant of summary judgment in favor of Mr. Lauck and Mr. Toth on all § 1985 claims and on all § 1983 claims based on participation in a conspiracy was appropriate.[9]

---

[9] We note that the district court granted Mr. Toth's motion to dismiss Mr. Williams' claims against him in his official capacity pursuant to Federal Rule of Civil Procedure 12(b)(6), reasoning that, in enacting 42 U.S.C. § 1983, Congress did not overturn the states' Eleventh Amendment immunity. *See* R.41 at 20 (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979)). The district court held that prosecuting attorneys in Indiana are state officials, precluding suit against them in their official capacity under the Eleventh

(continued...)

**B. Due Process**

Mr. Williams contends that the district court erred in granting summary judgment and motions to dismiss pursuant to Rule 12(b)(6) in favor of the defendants on his claims that he was denied due process.[10] In reviewing a procedural due process claim, we conduct a two-part inquiry, asking: "(1) whether the defendants deprived the plaintiffs of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). Property interests are not created by the Constitution; they are established by state law. *See Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 326 (7th Cir. 2002).

Mr. Williams was a county police officer in St. Joseph County, Indiana. The Indiana Code provides that "[a]ll county police officers appointed to the department under this chapter are on probation for a period of one (1) year from the date of appointment." Ind. Stat. 36-8-10-10(b). The Code also provides that the sheriff may dismiss an officer on probation without a hearing. *See* Ind. Stat. 36-8-10-11(d). Mr. Williams entered on duty on January 1, 1999; he was fired on August 4, 1999, within the first year of his employment. Consequently, he was a probationary employee when he was terminated. Therefore, the district court properly

---

[9] (...continued)
Amendment. *See id.* at 20-21.

[10] The district court treated the individual capacity claims against the Merit Board members under a quasi-judicial absolute immunity analysis and concluded that they were entitled to absolute immunity for the exercise of judicial discretion. Because we have determined that there was no constitutional violation, we need not address further the issue of immunity.

determined that Mr. Williams did not have a protected property interest in continued employment because of his at-will status. *See Phegley v. Indiana Dep't of Highways*, 564 N.E.2d 291, 295 (Ind. Ct. App. 1990) (stating "[a]s a general rule, an employee at will has no property interest in further employment"); *Indiana Alcoholic Beverage Comm'n v. Gault*, 405 N.E.2d 585, 589 (Ind. Ct. App. 1980) (stating that in Indiana an at-will government employee has no property interest in continued employment and is not entitled to procedural protections); *see also Moulton v. Vigo County*, 150 F.3d 801, 804 (7th Cir. 1998) (citing *Gault*, 405 N.E.2d at 589). We also note that the record will not support a determination that Mr. Williams was deprived of any liberty interest in pursuing his chosen occupation; there is no evidence that Mr. Williams was blacklisted from obtaining a comparable position after his termination. *See Trejo v. Shoben*, 319 F.3d 878, 889 (7th Cir. 2003) (requiring that discharge have the effect of blacklisting an employee before liberty interest in continued employment in his chosen field is infringed); *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (stating that an infringement of an employee's liberty interest to pursue the occupation of his choice requires public disclosure of a stigmatization by the defendant's conduct resulting in a tangible loss of employment opportunities).[11]

---

[11] Mr. Williams also contends that the Merit Board members and Chief Waugh violated his procedural due process rights by failing to accord him a hearing before he was deprived of his fundamental interest in free speech protected by the First Amendment. We decline to address this unsettled issue because we already have concluded that Mr. Williams' comment was not protected under the *Pickering* test. *See Waters v. Churchill*, 511 U.S. 661, 668-71 (1994) (plurality opinion); *Id.* at 686-89 (Scalia, J., concurring). *See also* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 17.4, at 54

(continued...)

### C.  Equal Protection

Count III of Mr. Williams' complaint alleges that the defendants, individually and in their official capacities, violated 42 U.S.C. §§ 1983 and 1985 based on disparate treatment and the creation of a hostile work environment in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* R.1 at 12-16. Mr. Williams can prevail on his equal protection claim by offering direct proof of discriminatory intent, or he may prove discriminatory intent by circumstantial evidence. In the employment context, the latter approach is usually accomplished through the use of the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996); *Bruno v. City of Crown Point*, 950 F.2d 355, 361 (7th Cir. 1991). Under the *McDonnell Douglas* approach, "the plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination, which creates a presumption that the employer unlawfully discriminated against the plaintiff." *Helland*, 93 F.3d at 329. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the action alleged by the plaintiff to be discriminatory. *See Helland*, 93 F.3d at 329. Once the employer has shouldered its burden of production, the plaintiff then must establish by a preponderance of the evidence that the proffered reasons for the alleged discriminatory action are pretextual. *See Bruno*, 950 F.2d at 363 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

As in most cases of discrimination in the employment

----

[11] (...continued)
(3d. ed. 1999); Henry P. Monaghan, *First Amendment "Due Process,"* 83 Harv. L. Rev. 518, 525 (1970).

context, Mr. Williams does not make out a case of discriminatory intent through reliance on direct evidence of discriminatory intent. We therefore turn to the indirect method outlined in *McDonnell Douglas* to ascertain whether he has established a case through circumstantial evidence. To establish the basic prima facie case of an equal protection violation, Mr. Williams must demonstrate that (1) he is a member of a protected class, (2) he is similarly situated to members of the unprotected class, (3) he suffered an adverse employment action, and (4) he was treated differently from members of the protected class. To this formulation, some of our cases add independently a fifth criterion: that the defendant acted with discriminatory intent[12] —although such an addition is really a redundancy.[13]

---

[12]  *See McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993).

[13] Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection. *See Helland v. South Bend Cmty. Sch. Corp.,* 93 F.3d 327, 329 (7th Cir. 1996) (analyzing Title VII and equal protection simultaneously and applying *McDonnell Douglas* burden shifting to prove indirect evidence of intent); *Bruno v. City of Crown Point*, 950 F.2d 355, 361 & 363 (7th Cir. 1991) (same); *Friedel v. City of Madison*, 832 F.2d 965, 971-72 (7th Cir. 1987) (same); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming that the Title VII *McDonnell Douglas* framework is fully applicable to racial discrimination claims under § 1983).

Although, under Title VII, the prima facie case under *McDonnell Douglas* constitutes a rebuttable presumption of discriminatory intent, a number of this court's cases nevertheless indicate that a separate showing of intent is required to meet one's equal protection prima facie burden before proceeding to the *McDonnell Douglas* burden shifting. *See Chavez v. Illinois State*

(continued...)

Upon examination of the record, we must conclude that Mr. Williams has not provided evidence sufficient to withstand summary judgment. First, Mr. Williams has not identified a similarly situated administrator of the unprotected class who was treated more favorably. *See McPhaul v. Bd. of Comm'rs of Madison County,* 226 F.3d 558, 565 (7th Cir. 2000). Mr. Williams assumes that the relevant similarly situated class would be all administrative officers in the sheriff's department. However, he has provided no evidence that his performance was satisfactory other than his own statements to that effect. In contrast, Sheriff Seniff has presented a number of nondiscriminatory bases for his decision to terminate Mr. Williams, including Mr. Williams' disagreement with the Sheriff's negative assessment of his job performance at the August 4, 1999 performance evaluation and Mr. Williams' refusal to submit to a polygraph exam. *See* R.80, Ex.Seniff Aff. at 2-3. Sheriff Seniff's criticisms of Mr. Williams' performance included displeasure with Mr. Williams' lack of punctuality, poor communication skills, strained relationships with other agencies, and failure to reduce the jail population, a task with which he had been

---

[13] (...continued)
*Police,* 251 F.3d 612, 635-36 (7th Cir. 2001) (dividing equal protection analysis into a two-part analysis of first proving discriminatory effect (analogous to Title VII prima facie case factors) and then requiring proof of discriminatory purpose); *McPhaul,* 226 F.3d at 564 (listing proof of intent as an element of prima facie case); *Greer v. Amesqua,* 212 F.3d 358, 370 (7th Cir. 2000) (same); *McNabola,* 10 F.3d at 513 (same). We think that these latter cases are best read as simply emphasizing the requirement that § 1983, like disparate treatment cases under Title VII, require ultimately proof of discriminatory intent.

charged. *See* R.39; R.76, Ex.Williams Dep. at Ex.B.[14] Mr. Williams' only evidence contradicting Sheriff Seniff's evaluation of his performance is his own deposition. Mr. Williams contends that the Sheriff's negative evaluation of his performance was factually incorrect. Mr. Williams seeks to rebut charges by citing selected examples of the Sheriff's complaints and arguing that they are pretextual. *See* Appellant's Br. at 24-25 (contesting evaluation of strained relationships, poor communication skills, failure to attend early morning meetings, and failure to accomplish assigned tasks).

We have stated that generally, "[a]n employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability." *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992); *see also Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999) (quoting *Gustovich*). However, we recently clarified this principle by noting explicitly that it is not the mere self-serving nature of a nonmovant's affidavit that renders such evidence infirm. Rather, it is the absence of personal knowledge or the failure to set forth

---

[14] Sheriff Seniff's written performance evaluation of Mr. Williams, dated July 30, 1999, evaluated Mr. Williams' performance in nine categories and gave him an overall rating of "unsatisfactory." R.76, Ex.Williams Dep. at Ex.B. Mr. Williams received a "needs improvement" evaluation in the areas of: communications, dependability, judgment, problem solving, and quality. *See id.* Mr. Williams received an "unsatisfactory" rating for: cooperation, initiative, job knowledge, as well as planning and organization. *See id.* The Sheriff's review was detailed and emphasized that Mr. Williams created friction and strained relationships with other municipal agencies, that his tardiness was a consistent problem, and that the management team lacked confidence in his ability. *See id.*

"specific facts" as required by Rule 56(e) of the Federal Rules of Civil Procedure that is problematic. *See Payne v. Pauley*, 02-2674, 2003 WL 21540424, at \*4-5 (7th Cir. July 9, 2003). Here, a review of the record demonstrates that, although Mr. Williams disputes the factual basis for *some* of the Sheriff's complaints about his performance, he has produced insufficient evidence to permit a jury to conclude that the Sheriff's estimation of his overall performance was pretextual. Because Mr. Williams has produced insufficient evidence to create a material dispute regarding Sheriff Seniff's nondiscriminatory explanations for firing him, the appropriate class for comparison would be underperforming administrative officers. When evaluated from this perspective, the record does not contain sufficient evidence to support a contention that unprotected administrators with deficient performance evaluations were treated more favorably than Mr. Williams.

Indeed, the same evidence leaves undisturbed Sheriff Seniff's assertion that he terminated Mr. Williams for the nondiscriminatory reason of poor performance. Mr. Williams' assertion that he heard a rumor that Sheriff Seniff had uttered racial slurs impugning African-Americans at some point in the past does not alter this analysis. *See* R.76, Ex.Williams Dep. at 41. Such isolated and attenuated statements are insufficient to establish discriminatory intent in this case. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process."). Mr. Williams also testified that Sheriff Seniff failed to hire minorities recommended by Mr. Williams, *see* R.76, Ex.Williams Dep. at 43 & 65, that he was excluded from input in the hiring process, *see id.* at 44, and that he was

excluded from social activities, *see id.* at 63-64.[15] These assertions could hardly sustain a jury verdict that Sheriff Seniff terminated Mr. Williams because of his race.

Mr. Williams also notes that, after his termination, Mr. Lauck allegedly made a racially derogatory statement and commented that he was pleased to learn of Mr. Williams' termination. *See* R.76, Ex.Tracy Lieb Dep. at 21. Mr. Williams contends that this statement proves that Mr. Lauck acted with racial animus in calling Sheriff Seniff and attempting to influence him to terminate Mr. Williams. However, we have held that, if a person "not involved in the decisionmaking . . . expressed discriminatory feelings, that is not evidence that the decision was discriminatory." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). In *Gorence*, we did qualify this principle by noting that those who provide input into the decision can under some circumstances provide evidence of discriminatory intent. *See id.* However, in this case, Sheriff Seniff has stated by affidavit that he alone made the decision to terminate Mr. Williams. *See* R.80, Ex.Seniff Aff. at ¶ 15. Mr. Lauck's affidavit simply states that he had a conversation with the Sheriff in which Sheriff Seniff stated that he had heard the F.O.P. was displeased with Mr. Williams' comment, a fact that Mr. Lauck confirmed. *See* R.80, Ex.Lauck

---

[15] Mr. Williams also notes that, prior to his evaluation, there was no history of performance reviews being conducted in the sheriff's department. *See* R.76, Ex.Williams Dep. at 82-83. However, Sheriff Seniff was newly elected and had taken office in January of 1999. He explained that he decided it would be appropriate to begin with the most problematic employee, Mr. Williams. *See* R.76, Ex.Seniff Dep. at 84. Sheriff Seniff stated that, after Mr. Williams' performance review, all other administrators were given reviews. *See id.* at 113-14. Mr. Williams has failed to present any evidence rebutting this contention.

Aff. at ¶ 5. Mr. Lauck testified that he and Sheriff Seniff did not discuss the issue of Mr. Williams' employment. *See id.* at ¶ 6. Mr. Williams has produced no evidence that Mr. Lauck's call influenced Sheriff Seniff's decision to terminate Mr. Williams. We therefore cannot conclude that the alleged racially derogatory remark supports Mr. Williams' claim of discriminatory intent. Therefore, Mr. Williams has provided insufficient evidence to establish his prima facie case. His claim for disparate treatment was correctly dismissed by the district court.

Finally, the district court correctly rejected Mr. Williams' contention that the defendants are liable for creating a racially hostile work environment. Mr. Williams' own deposition testimony fundamentally undercuts his claim that he objectively and subjectively endured a hostile work environment. *See McPhaul*, 226 F.3d at 566 n.6 (noting parallel between equal protection and Title VII "hostile environment" claims and applying same standard). Mr. Williams admits that Sheriff Seniff never said anything racist about him, that Sheriff Seniff never "disrespected" him, and that Sheriff Seniff never made comments to Mr. Williams with racial overtones. *See* R.76, Ex.Williams Dep. at 42-43. Nor has Mr. Williams introduced evidence that other members of the police department uttered racially derogatory comments directed at him, contributing to a hostile work environment. Additionally, we do not find that Mr. Williams' testimony of exclusion from social activities and from the hiring process is sufficient to support a hostile work environment claim.[16] We therefore cannot conclude that Mr. Williams has presented sufficient evidence that his

---

[16] Additionally, in his deposition, Mr. Williams admitted that Mr. Lauck played no role in creating the alleged hostile work environment. *See* R.80, Ex.Williams Dep. at 201-02.

workplace approached the level of a hostile environment by being " 'so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment.' " *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 713 (7th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).

## D.  Title VII

Mr. Williams alleges that the actions of Sheriff Seniff as an agent of St. Joseph County and Mr. Lauck as an agent of the F.O.P., serving as his labor union, amounted to disparate treatment and created a hostile work environment based on his race in violation of Title VII. As noted above, our Title VII and equal protection hostile work environment analyses are parallel. *See McPhaul*, 226 F.3d at 566 n.6. Under the equal protection analysis, we found that Mr. Williams had not introduced evidence sufficient to carry his burden of proving either disparate treatment or a hostile work environment. That conclusion is equally applicable under Title VII. *See id.*

## E.  Tortious Interference with a Contractual Relationship

In his initial complaint,[17] Mr. Williams included a fifth

---

[17] Mr. Williams' proposed First Amended Complaint sought to add a claim entitled "Interference with Contract of Employment," R.51, Complaint at 27-28, which explicitly alleged all require-
(continued...)

count entitled "Breach of Contract and Wrongful Termination." R.1 at 22. The claim named all "Defendants" collectively, which included Mr. Lauck and Mr. Toth by reference. *See id.* at 25. The district court construed this claim as one for breach of contract and granted Mr. Lauck's and Mr. Toth's Rule 12(b)(6) motions to dismiss for failure to state a claim, concluding that they were not in privity with Mr. Williams concerning his employment contract. *See* R.41 at 11-12 & 25-26. In his response to the motions to dismiss, Mr. Williams had attempted to clarify that he had intended to claim a violation of tortious interference with his contractual relationship, which does not require privity. However, the district court rejected this attempt and stated that a complaint may not be amended by a brief in opposition to a motion to dismiss. *See id.* at 11.

This court reviews de novo a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 493 (7th Cir. 1998). Pursuant to the notice pleading regime of Federal Rule of Civil Procedure 8(a), Mr. Williams' complaint must only allege facts upon which relief may be granted. "[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal."

---

[17] (...continued)

ments for tortious interference with a contractual relationship. However, the district court rejected Mr. Williams' motion for leave to amend his complaint, because the proposed amendment contained references to previously dismissed claims. *See* R.58 at 2. Mr. Williams claims that the district court abused its discretion in failing to grant him leave to amend the complaint. Because we find that Mr. Williams' initial complaint was sufficient to state a claim under Federal Rule of Civil Procedure 8(a), the issue of whether leave to amend the complaint should have been granted is moot.

*Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The district court concluded that, "because the complaint doesn't allege privity of contract between Mr. Williams and Mr. Lauck," Mr. Williams did not allege facts sufficient to prove a breach of contract or wrongful discharge. *See* R.41 at 11-12.[18] The district court essentially required Mr. Williams to match his factual allegations to the legal theories set out in the caption to Count V: "Breach of Contract or Wrongful Discharge." This is an incorrect application of the notice pleading regime. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that the simplified notice pleading standard of Fed. R. Civ. P. 8(a) applies to all civil actions, with limited exceptions such as fraud and mistake outlined in Fed. R. Civ. P. 9(b)); *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) ("Federal practice uses a notice-pleading system, not a code-pleading system."); *Bartholet*, 953 F.2d at 1078 (stating that a court should ask "whether relief is possible under any set of facts that could be established consistent with the allegations").

Mr. Williams intended to proceed against Mr. Lauck and Mr. Toth on a theory of tortious interference with a contractual relationship, which consists of five elements under Indiana law: "1) existence of a valid and enforceable contract, 2) defendant's knowledge of the contract's existence, 3) defendant's intentional inducement of breach of contract, 4) the absence of justification, and 5) damages resulting from defendant's wrongful inducement of breach." *Keith v. Mendus*, 661 N.E.2d 26, 36 (Ind. Ct. App. 1996); *see Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 284-85 (Ind. 1991) (concluding that a claim for tortious

---

[18] The court first addressed Mr. Lauck's liability under the fifth count and then applied the analysis equally to Mr. Toth later in the opinion. *See* R.41 at 11-12 & 25-26.

interference with an employment relationship may be maintained on a contract terminable at will); *Bradley v. Hall*, 720 N.E.2d 747, 751 (Ind. Ct. App. 1999) (same).[19] Mr. Williams' initial complaint pleaded facts sufficient to support a claim for recovery under this theory against Mr. Lauck and Mr. Toth. The district court's requirement of privity of contract was inappropriate and the grant of Mr. Lauck's Rule 12(b)(6) motion, being premised on a mistake of law, constituted an abuse of discretion.

We do not believe, however, that this misstep requires reversal of the judgment. As we shall explain in the following paragraphs, the record makes clear that this claim for tortious interference with a contractual relationship could not survive summary judgment. *See Edwards v. Illinois Bd. of*

---

[19] We note that Mr. Williams' briefs refer to two different tort claims under Indiana law: interference with a contractual relationship and interference with an employment relationship. *See* Appellant's Br. at 8-9 (referring to claims of "contractual interference and interference with employment relationships"); Williams Reply Br. at 19 (referring to a theory of "tortious interference with employment"); *see also* 27 Indiana Law Encycl., *Torts* § 28, at 616-21 (1999) (noting differences between torts of intentional interference with a contract and intentional interference with a prospective business relationship). However, the principal case upon which Mr. Williams relies, *Keith v. Mendus*, 661 N.E.2d 26 (Ind. Ct. App. 1996), outlines the standard for tortious interference with a contractual relationship. *See id.* at 36. The Indiana Court of Appeals has held that intentional interference with an employment relationship requires the additional showing that the defendant engaged in illegal conduct. *See Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000). Mr. Williams does not refer to the illegality element; we therefore construe his claim as one of tortious interference with a contractual relationship.

*Admissions to the Bar*, 261 F.3d 723, 728 (7th Cir. 2001) (noting that court of appeals may affirm on any ground supported by the record). Mr. Williams must come forth with credible evidence on all matters upon which he bears the burden of proof at trial, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and he has failed to do so in regard to the third and fifth elements of the cause of action: intentional inducement of a breach of contract and damages.

Under Indiana law, "[l]iability for interference with contractual relationships results only if there was an intentional interference without justification or cause with an intention to do wrongful harm or injury." *Helvey v. O'Neill*, 288 N.E.2d 553, 559 (Ind. Ct. App. 1972); *see Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994) (stating that intentional interference with a contract "includes any intentional, unjustified interference by third parties with an employment contract"). Mr. Williams' proof that Mr. Lauck intentionally induced a breach of contract amounts to nothing more than the previously discussed testimony that Mr. Lauck voiced the F.O.P.'s displeasure with Mr. Williams' statement in the media to Sheriff Seniff, *see* R.80, Ex.Lauck Aff. at ¶ 5, Mr. Williams' "internal suspicions" that this expression of displeasure was the reason for his termination, R.80, Ex.Williams Dep. at 199; and Mr. Lauck's racially derogatory statement about Mr. Williams, *see* R.76, Ex.Tracy Lieb Dep. at 21. With respect to the claim against Mr. Toth, the evidence simply establishes that Mr. Toth called Sheriff Seniff to complain, for we have determined that Alan Lieb's testimony that Mr. Toth was "involved with the termination" is not sufficient evidence from which to infer Mr. Toth's participation in the alleged conspiracy to influence the Sheriff's termination decision. Moreover, Sheriff Seniff's affidavit testimony that he alone made the decision to terminate Mr. Williams is uncontradicted. *See* R.80, Ex.Seniff Aff. at ¶ 15. We cannot conclude

that this evidence is sufficient to support a finding of an intentional inducement of the breach of an employment contract.

More fundamentally, Mr. Williams has failed to rebut Sheriff Seniff's explanations for his discharge. This failure results in a lack of evidence that Mr. Williams incurred "damages resulting from [Mr. Lauck and Mr. Toth's] wrongful inducement of breach." *Keith*, 661 N.E.2d at 36. Assuming that Mr. Lauck and Mr. Toth intentionally attempted to induce Sheriff Seniff to fire Mr. Williams, there still would be no "but for" causation because Mr. Williams has failed to rebut Sheriff Seniff's nondiscriminatory reasons for firing him.

In affirming the judgment on this claim by concluding it could not survive summary judgment, we are mindful of the problems that may arise if the plaintiff has not been accorded sufficient opportunity to conduct discovery on the previously dismissed claim. However, because the district court did not dismiss all of Mr. Williams' § 1983, § 1985 and Title VII claims on the pleadings, Mr. Williams had the opportunity to conduct discovery on the issues of intent and damages. Therefore, we cannot conclude that Mr. Williams is prejudiced by our alternative resolution of the issue.

We also note that Mr. Williams' fifth count is a pendent state law tort claim. In *Payne for Hicks v. Churchich*, 161 F.3d 1030 (1998), we stated that, when the district court dismisses all federal claims before trial, "the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Id.* at 1043. These exceptions include: running of the state law cause of action's statute of limitations and cases where "sending the case to another court will cause a substantial duplication of effort." *Moses v. County of Kenosha*, 826 F.2d 708, 710-11 (7th Cir. 1987) (quotation marks and citation omitted). In this case,

discovery has been completed, and a transfer to state court would not permit Mr. Williams to uncover additional facts to support his claim. Consequently, we dismiss the claim with prejudice.

**F.  Sanctions and Damages**

Mr. Lauck has filed a motion for sanctions and costs pursuant to Federal Rule of Appellate Procedure 38. In weighing such a request for sanctions, "we consider first whether the appeal is indeed frivolous, and, if so, whether sanctions are appropriate." *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 841 (7th Cir. 1999). In *Hernandez v. Joliet Police Department*, 197 F.3d 256 (7th Cir. 1999), we declined to impose sanctions for arguments that were nonmeritorious, but which created "some conceivable chance of reversal." *Id.* at 265-66. We conclude that, although the issues presented on appeal by Mr. Williams do not result in success, they are not so clear as to prevent "some conceivable chance of reversal." *Id.*

**Conclusion**

For the foregoing reasons, the judgment of the district court is affirmed.

                                                        AFFIRMED

A true Copy:

　　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*